BENJAMIN P. LECHMAN
California State Bar Number 185729
11400 W. Olympic Blvd., Suite 200
Los Angeles, California 90064
Telephone: (619) 733-9789

Attorney for Defendant Pasley

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, ) | CASE NO. 23CR00270-7 |
|---|---|
| Plaintiff, ) | DATE: October 23, 2024 |
| ) | TIME: 10:00 a.m. |
| v. ) | |
| ) | |
| LAKE DAVIS PASLEY, ) | |
| ) | |
| ) | DEFENDANT'S SENTENCING |
| Defendant. ) | <u>POSITION</u> |
| _____ ) | |

TO:  TO THE HONORABLE SHERILYN PEACE GARNETT, UNITED STATES DISTRICT JUDGE, THE UNITED STATES ATTORNEY'S OFFICE AND ITS ATTORNEYS OF RECORD, SURIA MARIE BAHADUE AND KEVIN B. REIDY; AND ABIMBOLA FOWLER, UNITED STATES PROBATION OFFICER:

   The defendant, Mr. Pasley, through his counsel, Benjamin P. Lechman, hereby submits and files the following Sentencing Position in the above-entitled matter. Mr. Pasley's position is based upon the attached memorandum of points

and authorities, the files and records in this case, the United State Probation Office's Presentence Report, and any other evidence or argument presented at sentencing. Mr. Pasley respectfully reserves the right to supplement this memorandum if additional information becomes known.

                                                  Respectfully submitted,

Dated: October 7, 2024                 s/Benjamin P. Lechman
                                                  **BENJAMIN P. LECHMAN**
                                                  Attorney for Defendant Pasley

# I.
# INTRODUCTION AND OBJECTIONS

On July 3, 2024, Mr. Pasley pleaded guilty to Count Three of the Indictment in this case, charging him with distributing a mixture or substance containing a controlled substance in violation of 21 U.S.C. § 841. Mr. Pasley agrees with the facts and guideline calculations contained within the PSR.[1]

The USSG submitted by Mr. Pasley are as follows:

```
BOL USSG § 2D1.1(c)(6)              28
Minor Role  § 3B1.1                 -2
Acceptance of Responsibility § 3E1.1  -3
Variance § 3553a                    -3

Overrepresentation of CHC           -II
Final: AOL 20 & CHC IV = 57-63 months
```

Mr. Pasley makes just two substantive requests here of this Court: a sentence of 60-months and a recommendation for the Bureau of Prison's RDAP program.

---

[1] Mr. Pasley's only quarrel (if it could be called that) with the PSR, is its inclusion of information concerning the "Westside Wilmas" gang in the PSR at ¶ 16. Mr. Pasley is not, and has never been, a member or associate of that (or any other) gang.

## II.
## MR. LAKE DAVIS PASLEY

Mr. Pasley is a relatively young man who has lived much of his adult life as a drug addict. He pled guilty to delivering drugs for lead defendant Limon on one occasion. He requests half a decade in prison, and drug treatment, as a result of his unfortunate actions, for the reasons set forth below.

**A. Sy Sperling's example: Mr. Pasley is an addict, not a dealer.**

More than 40 years ago, businessman Sy Sperling experienced hair loss and was unhappy with the poor quality of available solutions. In 1976 Sperling began the Hair Club for Men, an American hair restoration, hair regrowth, and hair replacement company with locations in the United States and Canada.[2] Sperling was best known for his TV ads in the 1980s that famously pitched his hair restoration club with the tag line, "I'm not only the Hair Club president, but I'm also a client."[3]

Mr. Pasley, like many addicts, could make a similar – but less comical – claim: *I'm not only a drug deliverer; I'm also an addict myself.*

That's the rub here: although Mr. Pasley has pleaded guilty to federal drug distribution charges, he's not really a dealer. He's an addict. It's hard to imagine

---

[2] https://en.wikipedia.org/wiki/HairClub
[3] https://www.cnn.com/2020/02/20/us/sy-sperling-hair-club-for-men-dies/index.html

Congress contemplating a low-level couch-surfing addict like Mr. Pasley when it decided to enact the federal Controlled Substances Act, which was, according to Congress, aimed at combatting large-scale drug dealing.[4]

An addict needs treatment much more than they need a lengthy prison term. As noted in the PSR, Mr. Pasley has never received substantive in-patient drug treatment. PSR at ¶ 95. But that treatment could mean the difference between life and death for Mr. Pasley.

### B. This is your brain on drugs: Mr. Pasley's adolescence has unfairly influenced his adult choices.

In 1987, almost a decade before Mr. Pasley was born, the Partnership for a Drug-Free America (PDFA) launched a series of cringe-worthy televised public service announcements (PSAs) and a related poster campaign, entitled "This Is Your Brain on Drugs."[5]

The 30-second version of the first PSA shows a man in a kitchen asking if there is anyone out there who still does not understand the dangers of drug abuse. He holds up an egg and says, "This is your brain," before motioning to a frying pan and adding, "This is drugs." He then cracks open the egg, fries the contents, and

---

[4] See, e.g., https://www.ncbi.nlm.nih.gov/books/NBK574544/

[5] https://en.wikipedia.org/wiki/This_Is_Your_Brain_on_Drugs

says, "This is your brain on drugs." Finally, he looks up at the camera and asks, "Any questions?"[6]

The PSA's aired before methamphetamine use had become so widespread and its oversimplification of the complex phenomenon of addiction resulted in various parodies. But, as it turns out, for young meth users of the future, like Mr. Pasley, the message was, in a sense, prescient; young meth users actually do experience cognitive issues as a result of their drug use.

It happened to Mr. Pasley. As noted in the PSR, Mr. Pasley was just a kid when he began his descent into addiction. Mr. Pasley has, since adolescence, lived mostly as a drug addict. He has been a severe drug user since age 15. PSR at ¶ 91. He began making himself feel better with methamphetamine as a coping device. *Id*. It's a bad call for anyone, but particularly so for someone so young, as methamphetamine has a devastating effect on brain development, particularly when it comes to hippocampal development (the area of the brain controlling the cognitive aspects involved in decision –making).

According to the Journal of Neurochemistry, methamphetamine use during adolescence contributes to methamphetamine-induced cognitive impairments.[7] Methamphetamine plays havoc with the brain's acetylcholine system, which plays

---

[6] *Id.*
[7] *Journal of Neurochemistry*, Volume 119, Issue 1, p.27 (September 9, 2011).

a unique and important role in cognitive functioning; additionally, methamphetamine exposure alters the acetylcholine system in adolescence, so Mr. Pasley's poor life choices are not surprising.[8] A 15-year old, like Mr. Pasley, regularly using meth will simply stunt their own cognitive development.

Ms. Pasley's methamphetamine use as an adolescent devastated his adult decision-making faculties. It's a scientific fact. Researchers from South Korea and the University of Utah reported that MRI brain scans of chronic meth abusers revealed damage to the gray matter and white matter of all users, affecting important cognitive abilities and impeding communications between different regions of the brain.[9]

When the adolescent brain region is influenced, "it then creates a vicious cycle in adolescents with already less control over their impulses than adults," said In Kyoon Lyoo, MD, PhD, of Ewha W. University in Seoul, in an interview. "As we mature into adulthood, we have more control over our impulses. But if meth damages that part of the brain before it's fully developed, it becomes a difficult story for adolescents trying to control risky behavior or stop using meth."[10] Not surprisingly, Mr. Pasley continued his poor decision-making, dropped out of

---

[8] *Id*.

[9] <https://www.promises.com/articles/amphetamines/new-study-meth-far-more-dangerous-to-adolescent-brains/>.

[10] *Id*.

school in the 10th grade and never returned. PSR at ¶ 96. He then discovered heroin, and then opiates, and he descended further.

Mr. Pasley really tried to turn it around. As noted in the PSR, he moved to Hawaii to get away from the people with whom he used. PSR at ¶ 90. However, when he ultimately returned to the mainland, he also returned to his dark path of addiction.

He has primarily lived on his own since age 15, and his life has been, like that of most addicts, a difficult one. According to a study published by the National Library of Medicine, one common experience shared by long-term addicts, is the sale of drugs to support one's addiction.[11] This problem has become so ubiquitous that some have called for policy changes to our nation's drug laws, to account for the user-dealer phenomenon.[12]

As noted by his grandmother, in her letter of support, Mr. Pasley is by nature a good, caring and gentle person. He took care of his grandmother when she was hospitalized. [Appendix A] Addiction changed his path dramatically.

As noted in the PSR, at the time of the instant offense, Mr. Pasley was deep in his addiction and living at a trap house with other addicts. As noted in the PSR,

---

[11] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3197264/
[12] https://drugpolicy.org/drugsellers

he was simply doing favors for lead defendant Limon, in exchange for a couch to sleep on and drugs:

> "Pasley's known conduct was limited to acting as a courier, on behest of Nunez, on a single occasion on October 26, 2022. He received directives from Nunez via Limon who communicated via telephone conversations and text messages with the UC and CS-2. Nunez negotiated the price and amount and organized the details of the drug transaction, including the time and location before contacting Limon who sent Pasley to the transaction. Although Pasley may have been aware of the amount of fentanyl he delivered, there is no indication that he was aware of the scope or structure of the larger trafficking scheme." PSR at ¶ 42.

It's true: Mr. Pasely was living a nowhere existence that only brought him emptiness, and which now will bring him substantial prison time, but his arrest in this case may be a dividing line in his life that dramatically changes his life and gets him back on track.

This Court is in a unique position. It could impose a lengthy draconian guideline sentence or it could instead impose (the still lengthy) 60-month minimum mandatory term here with a recommendation for RDAP and drug treatment as a condition of supervised release and make a real sea change in the life of this young man.

Mr. Pasley's family echo this sentiment in both their comments to the Probation Department (PSR at ¶ 75-83) and the sentencing support letter submitted by long-time family friend, Raquel Farfan:

"I am truly concerned that if Lake gets jail time with no type of treatment or therapy, Lake will not have a fair chance, once he has done his time. You see, this young man, has his whole life ahead of him. he still has a chance. Lake has so much to offer society, given the proper tools to help him win these battles that no person can fight alone." [Appendix A]

The family photos also attached within Appendix A, plainly depict a young man who had love and support and sadly lost his way but could, with some residential drug treatment, regain his footing in life and rejoin that familial support system. They are eager to have him back, as noted in their letters and discussions with the Probation Department.

### C. Stat padding: this Court should depart downward based on the overrepresentation of Mr. Pasley's criminal history.

A quick look at the drug-related arrests in Mr. Pasley's prior criminal record doesn't tell the story of a nefarious criminal. It tells the more banal tale of a young kid who got hooked on drugs and never really regained the upper hand against addiction in his life. He has so far received only minimal outpatient treatment, and thus the focus of this case should be getting Mr. Pasley real help.

Mr. Pasley is in Criminal History Category VI, the literal highest category available. But even a cursory review of his history shows that statistic to be padded. Stat padding is an action (often seen in sports) that increases a statistical number but does not correspond to the thing the statistic purports to measure.[13]

---

[13] https://en.wiktionary.org/wiki/stat_padding#:~:text=stat%20padding%20(uncountable),or%20its%20chance%20of%20winning

A padded stat is based on an action that improves a player's statistics despite being of little real world meaning. Old-time basketball player Jerry Lucas was one of the most prolific rebounders in the sport's history.[14] He was famous for padding his rebounding stats. He would tell players to take a wild shot 3 seconds before the buzzer so he could get the rebound before the buzzer went off. The rebound meant nothing in the actual contest; it was just a number, corresponding to a technically calculated truth, but not the real thing one would seek to actually measure: contested rebounds that meant something to the play.

Mr. Pasley's criminal history, while technically calculated correctly, is similarly *disconnected* from the real thing to be measured: criminality and the need for deterrence. Mr. Pasley's criminal history is either animated by, or a symptom of, his struggle with addiction, and really nothing else. As such, his criminal history score is a prime example of stat padding. The score of VI (the most serious), truly overrepresents, the seriousness of Mr. Pasley's (much less serious) past.

This Court can – and should – depart (horizontally) downward when it finds that "the nature of Defendant's prior convictions resulted in a criminal history category that overrepresented the seriousness of his history." *See United States v. Flores-Uribe,* 106 F.3d 1485 (9th Cir. 1997); *United States v. Rios-Favela*, 118

---

[14] https://en.wikipedia.org/wiki/Jerry_Lucas

F.3d 653, 658-59 (9th Cir. 1997). This departure in Mr. Pasley's case vindicates § 3553(a)'s focus on rehabilitation.

Mr. Pasley's family support and his history tell a surprising story about Mr. Pasley's ability to be rehabilitated and compels this Court to reduce his CHC score. The real § 3553(a) focus should be rehabilitation and treatment. A 60-month sentence with a recommendation for RDAP and a supervised release condition requiring drug treatment is the correct sentence.

During the Obama administration, the White House web site announced that it was reshaping its national drug policy. Rather than deriding those suffering from addiction as "liars," then-President Obama argues for a more modern, rational and educated understanding of drug addiction:

> "Throughout much of the last century, scientists studying drug abuse labored in the shadows of powerful myths and misconceptions about the nature of addiction. When science began to study addictive behavior in the 1930s, people addicted to drugs were thought to be morally flawed and lacking in willpower. Those views shaped society's responses to drug abuse, treating it as a moral failing rather than a health problem, which led to an emphasis on punitive rather than preventative and therapeutic responses."[15]

Are these words simply political rhetoric or did they have real world practical effect? The White House would seem to have meant what it said as it further offered the following observation:

> "Science demonstrates that addiction is a disease of the brain—a disease that can be prevented and treated, and from which people can recover. The

---

[15] *See* <<http://www.whitehouse.gov/ondcp/drugpolicyreform>>.

Administration's drug policy reflects this understanding by emphasizing prevention and access to treatment over incarceration, pursuing "smart on crime" rather than "tough on crime" approaches to drug-related offenses, and support for early health interventions designed to break the cycle of drug use, crime, incarceration, and re-arrest … [W]e simply cannot incarcerate our way out of the drug problem. Put simply, an enforcement-centric "war on drugs" approach to drug policy is counterproductive, inefficient, and costly."[16]

And as noted herein, Mr. Pasley's criminality is the result of his drug addiction and this Court should reduce his score from VI to IV, which is more in line with the actual statistic to be measured here.

### D. Keeping up with the Joneses: this Court should impose a 60-month sentence to avoid unwarranted disparity between Mr. Pasley and his codefendants.

This Court should sentence Mr. Pasley in line with his codefendants, most of who are arguably more culpable than Mr. Pasley. One of this Court's duties is to avoid unwarranted sentencing disparity. 18 U.S.C. § 3553(a)(6) obligates the Courts to consider and to recognize "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *United States v. Bullock*, 454 F.3d 637 (7th Cir. 2006).

As of this writing, several of the defendants charged in the indictment have been sentenced. Codefendant Ramon Gonzalez, Jr, received 36 months, and his role was greater than that of Mr. Pasley.  According to the government,

---

[16] *Id*.

Mr. Gonzalez distributed approximately 2,159 grams of methamphetamine for an agreed $4,250 payment (that he was ultimately stiffed on). [Dkt. #148] In contrast, Mr. Pasley was simply making a delivery so that he could have a couch upon which to sleep and another fix. He was not making money.[17]

Codefendant Guillermo Guerrero received a time served sentence. Similarly, his conduct was much more severe than that of Mr. Pasley. According to the government, Mr. Guerrero agreed to sell two firearms to an undercover law enforcement officer posing as a gun customer on behalf of an imprisoned Mexican Mafia associate in exchange for $3,200.  At the time of the meeting, Mr. Guerrero knowingly possessed several dangerous (and illegal) weapons, including: (i) a Romarm, Model Mini Draco, 7.62x39mm caliber semiautomatic pistol, (ii) an AK-style semi-automatic pistol with no serial number (commonly referred to as a "ghost gun"); (iii) five rounds of Norma .223 caliber ammunition; and (iv) 14 rounds of Cartridge Works .223 caliber ammunition. [Dkt. # 215] This is a much more serious offense than the simple addict delivery performed by Mr. Pasley.

---

[17] Mr. Pasley is aware that codefendant Jesse Delgado received a 120-month minimum mandatory sentence, but his conduct further underscores the gaping distinction between Mr. Pasley and many of the other defendants in this case. Mr. Delgado, according to the government, was a high-level dealer, distributing both large scale quantities of methamphetamine, but also illegal firearms and doing so across the street from a local high school. [Dkt. # 122]

While not yet sentenced, codefendant Jose Francisco Martinez Hernandez pleaded guilty, pursuant to a plea agreement, to distribution of nearly 5 pounds of methamphetamine and the government in his case is recommending 51 months imprisonment. [Dkt. # 231]

Even if one includes the sentence for Mr. Delagdo's aggravated behavior, the average sentence amongst all the defendants is 52 months, which is still less than that being advocated for Mr. Pasley, arguably the least culpable person in this entire case.

Given the comparatively light treatment (in contrast to the PSR's recommendation here) of his codefendants, a 60-month sentence for a person of Mr. Pasley's limited involvement is more than sufficient to satisfy the purposes § 3553(a) and comports with the evidence and relative culpability amongst the defendants in this case. *See, e.g., United States v. Bullock*, 454 F.3d 637 (7th Cir. 2006).

In *Bullock*, the defendant was convicted of distributing heroin and was held responsible for relevant conduct related to others in the overall conspiracy. However, those other participants received dramatically lower sentences. 454 F.3d at 640. The Seventh Circuit vacated the defendant's sentence, concluding that disproportionate nature of the disparity was compelled by § 3553. *Id.* at 640-41. A

60-month sentence for Mr. Pasley makes sense, in light of the sentences given to his codefendants.

This Court should act sensibly and impose a term of 60-months' imprisonment and a recommendation that Mr. Pasley participate in the Bureau of Prison's RDAP program.

## III.
## CONCLUSION

For all the above reasons, and the calculations set forth above, and the appropriate sentencing considerations under 18 U.S.C. Section 3553(a), Mr. Pasley requests that this Court impose the following sentence: (a) a term of 60-months' imprisonment; (b) a four-year period of supervised release; (c) a $100 special assessment; and (d) a recommendation that Mr. Pasley participate in the Bureau of Prison's RDAP program.

Respectfully submitted,

Dated: October 7, 2024

s/Benjamin P. Lechman
**BENJAMIN P. LECHMAN**
Attorney for Defendant Pasley